**FOX NEWS NETWORK, L.L.C., Plaintiff,**

v.

**TIME WARNER INC., Time Warner Entertainment Company, L.P., Turner Broadcasting Systems, Inc., and R.E. "Ted" Turner, III, Defendants.**

**TIME WARNER INC., Time Warner Entertainment Company, L.P., Time Warner Cable of New York City, Paragon Communications d/b/a Time Warner Cable of New York City, Queens Inner Unity Cable Systems d/b/a Quics, and TWC Cable Partners d/b/a Staten Island Cable, Counterclaim-plaintiffs,**

v.

**FOX NEWS NETWORK, L.L.C. and The News Corporation Limited, Counterclaim-defendants.**

No. 96–CV–4963.

United States District Court, E.D. New York.

April 10, 1997.

Yosef J. Riemer, Kirkland & Ellis, New York City, Richard Cordray, Washington, DC, Clifford Thau, Squadron, Ellenoff, Plesant & Sheinfeld, L.L.P., New York City, for Plaintiff and Counterclaim–defendants.

Julie North, Cravath Swaine & Moore, New York City (Robert D. Joffe, Stuart W. Gold, Rory O. Millson, Rowan D. Wilson, of counsel), Jay E. Gerber, Davis, Scott, Weber & Edwards, New York City, for Defendants and Counterclaim–plaintiffs.

WEINSTEIN, Senior District Judge:

TABLE OF CONTENTS

I. INTRODUCTION ........................ 342
II. FACTS ................................. 342
 A. Cable Television Generally ........... 342
 B. Cable Television in New York City ..... 343
 C. Time Warner/Turner Merger ......... 343
 D. The Alleged Conspiracy ............. 343
 E. Legal Actions ....................... 344
III. LAW .................................. 344
 A. Conspiracy to Violate Section 1983 ..... 344
 B. Rule 12(b)(6) ...................... 345
 C. Noerr–Pennington Doctrine .......... 345
IV. LAW APPLIED TO FACTS .............. 346
 A. Time Warner Has Stated Valid Counterclaims ...................... 346
 B. Fox is Not Necessarily Protected by Noerr–Pennington ................ 346
V. CONCLUSION .......................... 346

## I. INTRODUCTION

This case arises from a dispute between Time Warner and Fox over Time Warner's decision not to carry Fox News on its cable channels in New York City, and from the City's subsequent involvement in the controversy. *See, e.g., Time Warner Cable v. City of New York*, 943 F.Supp. 1357, 1391–96, (S.D.N.Y.1996) (Cote, J.); Clifford J. Levy, *An Old Friend Called Giuliani. and New York's Cable Clash Was On*, N.Y. Times, November 4, 1996, at B 1, B2. Fox and its allies sued Time Warner and its associates for damages, injunctive relief, and specific performance. Time Warner has counterclaimed, seeking damages and injunctive relief

Fox moves to dismiss the counterclaims as barred by the *Noerr–Pennington* doctrine, which prevents suits interfering with the right to petition the government. Its motion is denied.

## II. FACTS

A. Cable Television Generally

A discussion of the case requires some knowledge of the structure of the cable industry and of the laws which regulate it. The cable industry is comprised of operators and programmers. Operators own the physical assets of the cable system. They obtain the authority to lay the cable wires which transmit the signals by negotiating "franchise agreements" with local governments. Operators are responsible for managing the provision of cable services. Programmers, in general, produce programs intended for transmission over the cable systems. An operator typically contracts with a programmer if the operator wishes to carry the programming, paying the programmer a set fee per subscriber, per month. Under the complex federal regulatory scheme, cable operators must also retransmit local, over-the-air television programming. *See, e.g., Turner Broadcasting System, Inc. v. Federal Communications Commission*, —— U.S. ——, 117 S.Ct. 1174, —— L.Ed.2d —— (1997) (mandatory over-the-air broadcasts to be carried by cable networks raises serious freedom of speech issues).

Prior to 1984, the cable industry was regulated primarily at the local level through the franchise process. The Cable Communications Policy Act of 1984 ("Cable Act") established a national policy for regulation at the federal, state, and local levels. The Cable Act continued to rely on local franchising as the primary means of regulation.

Certain portions of the Cable Act are relevant. First, the Cable Act explicitly protects the programming decisions of cable operators, providing that "[a]ny Federal agency, State, or franchising authority may not impose requirements regarding the provision or content of cable services, except as expressly provided in this subchapter." 47 U.S.C. § 544(f)(1). The Cable Act also permits local governments, known as "franchising authorities," to require cable operators to set aside channels for public, educational, and governmental programming ("PEG" channels).

While the Cable Act itself does not identify what constitutes "educational" or "governmental" programming, its legislative history offers some indication of how Congress intended these stations to be used. The House Report finds:

> PEG channels . . . contribute to an informed citizenry by bringing local schools into the home, and by showing the public local government at work. [This Bill] continues the policy of allowing cities to specify in cable franchises that channel capacity and other facilities be devoted to such use.

H.R.Rep. No. 98–934 at 30, *reprinted in* 1984 U.S.C.C.A.N. 4655, 4667. The House Report notes that these channels are not intended to be leased for uses unrelated to PEG purposes. It states:

> There is no limitation imposed on a franchising authority's or other government entity's editorial control over or use of channel capacity set-aside for governmental purposes. However, the Committee does not intend that franchising authorities lease governmental channels to third parties for uses unrelated to the provision of governmental access . . . .

*Id.* at 47, *reprinted in* 1984 U.S.C.C.A.N. at 4684.

**B. Cable Television in New York City**

Time Warner operates the cable systems for northern and southern Manhattan, Brooklyn, Queens, and Staten Island pursuant to franchise agreements entered into with the City in 1983 and 1990. Under the franchises, Time Warner provides the City with nine stations for PEG use. In Manhattan, four of these channels have been designated for public access and are administered by a non-profit entity independent of the City. The remaining stations are run by the City.

The 1983 Agreement, which relates to the non-Manhattan franchises, indicates that the "Municipal Channels" shall be used for "distributing noncommercial services by the City or for any other lawful governmental service." Counter cl. ¶ 168. The 1990 Agreement, covering the Manhattan franchises, states that the "Governmental Channels" shall be used for governmental or educational purposes. It provides:

> Government channels [shall be] used for distributing services by the City or educational institutions for functions or projects related to governmental or educational purposes, including the generation of revenues by activities reasonably related to such uses and purposes.

Countercl. ¶ 169.

**C. Time Warner/Turner Merger**

In September, 1995, Time Warner Inc., the corporate parent of the franchisees, and Turner Broadcasting System, Inc. ("Turner"), agreed to merge. Turner produces programming for sale to cable operators, including the 24–hour Cable News Network ("CNN"). Time Warner anticipated that the Federal Trade Commission ("FTC") would require them to carry an additional, unaffiliated cable news service in order for the merger to receive approval. Consequently, Time Warner entered into negotiations with two emerging news services, MSNBC (a joint venture between Microsoft and NBC) and Fox News.

The Consent Decree required by the FTC as a condition of its consent to the merger mandates that Time Warner carry an unaffiliated news service on fifty percent of its cable systems within three years. The Decree does not insist that the unaffiliated news service be carried in New York City. The decision as to which systems will carry the unaffiliated news service is left to Time Warner, so long as the news service reaches fifty percent of Time Warner's cable customers.

A review of the merger was initiated by the New York City Department of Information Technology and Telecommunications ("DoITT"), the agency responsible for administering the City's franchises. Since the franchise agreements require Time Warner to obtain approval from the City before any change of "actual working control" of the franchises, the City needed to determine if the merger required the City's approval, and if so, to determine if it should be granted. Apparently the review process had been proceeding smoothly and favorably until Time Warner decided to carry MSNBC rather than Fox News.

**D. The Alleged Conspiracy**

Fox News is a fledgling all-news cable programming service, based in Manhattan. It is owned by News Corp., which is controlled by Chairman and C.E.O. Rupert Murdoch. Time Warner asserts that Murdoch, News Corp., and Fox News are political supporters of the current City administration. Time Warner alleges that following its decision not to carry Fox News, Fox and the City misused governmental power in an attempt to coerce Time Warner to carry Fox News on Time Warner's New York City cable systems.

The counterclaim alleges that Fox conspired unlawfully with City officials to threaten to derail the approval process for the Time Warner/Turner merger; that Fox conspired with City officials to threaten not to renew Time Warner's franchise agreement with the City; and that Fox conspired with City officials to abuse the City's limited authority over PEG channels to carry Fox News—all in retaliation for Time Warner's decision not to carry Fox News. Among the vivid allegations are that Fox conspired with City officials to use government "clubs" at Fox's behest and with Fox's assistance:

[T]o beat Time Warner over the head to force Time Warner to carry Fox News and to retaliate for refusing to do so—and to keep on beating Time Warner until Time Warner carried Fox News.

Countercl. Defs.' Supp. Mem. at p. 6.

It is Time Warner's view that after it decided to carry MSNBC, the City indicated that approval of the merger, as well as renewal of its franchise agreements, could be in jeopardy if Time Warner refused to carry Fox News. The claim is that Arthur Siskind, News Corp.'s General Counsel, wrote to the Deputy Mayor Fran Reiter, urging her to refuse to consent to both the Time Warner/Turner merger and to the renewal of Time Warner's franchise agreements; Deputy Mayor Reiter then "clearly conveyed" to Time Warner that "the City would condition approval of the merger on Time Warner's capitulation to the demand that Time Warner carry a speaker chosen by the City—Fox News...." Answer and Countercl. ¶ 190.

Fox and the City, it is asserted, devised two unlawful plans to achieve their goals. Under the first, the City would give up one of its governmental stations in exchange for Time Warner's agreement to carry Fox News on that newly available channel. When Time Warner objected, the City sought permission from Time Warner to carry Fox News on one of the City's PEG channels. After Time Warner rejected this plan as well, Fox decided to provide the City with a modified version of Fox News, with the commercials removed, and the City agreed to carry this programming on a PEG channel until the end of the year. Fox and the City allegedly hoped that this arrangement would allow Fox News to build viewer loyalty, so Time Warner would then be pressured into carrying Fox News.

### E. Legal Actions

On October 10, 1996, Time Warner filed suit against the City in the District Court for the Southern District of New York, seeking to enjoin the City from carrying Fox News. Judge Cote, in a comprehensive and well reasoned opinion, issued a temporary restraining order followed on November 6, 1996, by a preliminary injunction. She found that "[t]he City has engaged in a pattern of conduct with the purpose of compelling Time Warner to alter its constitutionally-protected editorial decision not to carry Fox News. The City's actions violate longstanding First Amendment principles...." *Time Warner Cable of New York City v. City of New York,* 943 F.Supp. 1357, 1403 (S.D.N.Y.1996). Judge Cote declared that the City's actions violated the Cable Act, the franchise agreements, and Time Warner's First Amendment rights. *Id.* at 1385–1402. Her opinion offers a clear and thorough examination of many of the events which give rise to the instant action, even though Fox, as a nonparty, is not bound by it.

On October 9, 1996, Fox filed the present suit alleging a number of antitrust violations. Time Warner moved to dismiss for improper venue. That motion was denied with leave to renew after further discovery.

The counterclaims allege that Fox, under color of law, (1) unlawfully conspired with the City to deprive Time Warner of its First Amendment rights, as guaranteed by Fourteenth Amendment, in violation of 42 U.S.C. § 1983; (2) unlawfully conspired with the City to deprive Time Warner of its procedural Due Process rights under the Fourteenth Amendment, in violation of 42 U.S.C. § 1983; (3) unlawfully conspired with the City to deprive Time Warner of its rights under 47 U.S.C. §§ 531 and 544 (portions of the Cable Act), in violation of 42 U.S.C. § 1983; and that it (4) tortiously interfered with contractual relations by intentionally attempting to procure the City's breach of its franchise agreements with Time Warner. Fox now moves to dismiss these counterclaims, asserting that Fox's activities were nothing more than lobbying, protected by the Constitution and the *Noerr–Pennington* doctrine.

### III. LAW

#### A. Conspiracy to Violate Section 1983

■ "[A] private party is subject to liability under section 1983 if he conspires with or willfully engages in joint activity with the State or its agents, ... even if the State agent is immune to liability." *Neustein v. Orbach,* 732 F.Supp. 333 (E.D.N.Y.1990) (ci-

tations omitted). To adequately allege a conspiracy to violate section 1983, a plaintiff must "allege with at least some degree of particularity overt acts which defendants engaged in which were reasonably related to the promotion of the claimed conspiracy." *Powell v. Workmen's Compensation Bd.*, 327 F.2d 131, 137 (2d Cir.1964); *see also Ostrer v. Aronwald*, 567 F.2d 551, 552 (2d Cir.1977).

■ In *Bertucci v. Brown*, 663 F.Supp. 447, 454 (E.D.N.Y.1987), the court found that plaintiff's general allegations of conspiracy actually described normal dealings with the state, and thus were insufficient for § 1983 liability. "All of the conduct alleged ... occurred in the normal course of Brown's criminal and civil actions against Bertucci." *Id.* It follows that "normal" interactions with the state are insufficient to support a conspiracy claim, while "abnormal" interactions may used to support such a claim. What is "normal" depends upon the specific actions relied on and their setting.

### B. Rule 12(b)(6)

A motion to dismiss should be granted if the complaining party has failed to state a claim upon which relief can be granted. Fed. R.Civ.P. 12(b)(6). "The district court should grant such a motion only if, after viewing [complaining party's] allegations in [the most] favorable light, 'it appears beyond doubt that the [complaining party] can prove no set of facts in support of [its] claim which would entitle [it] to relief' " *Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir.1992) (quoting *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir.1991)).

### C. *Noerr–Pennington* Doctrine

The First Amendment protects, among other things, the right of the people "to petition the Government for a redress of grievances." U.S. Const. Amend. 1. To protect this right, the courts have adopted the *Noerr–Pennington* doctrine, prohibiting suits "where the challenged activity involves lobbying...." *Hamilton v. Accu–Tek*, 935 F.Supp. 1307, 1316 (E.D.N.Y.1996) (citing *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961)). *See also, United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The doctrine originated as a limit on antitrust liability, but has been used to prohibit other types of proceedings, including civil rights actions and tortious interference claims. *See, e.g., Weiss v. Willow Tree Civic Ass'n*, 467 F.Supp. 803, 818 (S.D.N.Y.1979) ("the actions [of] defendants ... are protected by the First Amendment's guarantees for the rights to assemble, to petition ... and to associate.... [T]hey cannot serve as the basis for liability under the civil rights statutes"); *see also, e.g., Suburban Restoration Co. v. ACMAT Corp.*, 700 F.2d 98, 102 (2d Cir.1983) (claims based on the filing of a lawsuit).

■ Efforts to influence the government are not always protected by *Noerr–Pennington*. One exception recognized by the courts applies to lobbying activity which is found to be a "sham," and the other exception applies to activity that is "corrupt."

> First, efforts to influence government are not protected where they are found to be a 'sham' to disguise what is otherwise nothing more than an attempt to directly injure a competitor and the political actor has no real interest in the outcome. The Supreme Court has recognized that, by definition, a successful effort to influence governmental action cannot be considered a sham. Second, courts have declined to invoke the protection of *Noerr–Pennington* where the political activity involved illegal, corrupt or unethical means.

*Hamilton v. Accu–Tek*, 935 F.Supp. 1307, 1317 (E.D.N.Y.1996) (citations and internal quotations omitted). "[T]he solicitation of governmental action may be unprotected when the litigant's 'sole purpose' or 'principal purpose' for making the solicitation is the commission of the wrongful act." *P. & B. Marina, L.P. v. Logrande*, 136 F.R.D. 50, 52–53 (E.D.N.Y.1991) (citations omitted).

■ The second exception covers more than "corruption" in a venal sense. "[I]llegal, corrupt *or* unethical means" are excepted. *Hamilton v. Accu–Tek*, 935 F.Supp. 1307, 1317 (E.D.N.Y.1996) (emphasis supplied). Activity which might not be consid-

ered corrupt in a monetary sense may nevertheless be illegal or unethical.

 Section 1983 was enacted in order to provide redress for the deprivation of rights caused by abuse of authority. *See* 42 U.S.C. § 1983; *see also Tizes v. Curcio,* 1995 WL 476675, at *5 (N.D.Ill. Aug. 9, 1995) ("[T]he right to petition is intended to permit citizens to have their grievances addressed by the government, not to provide citizens with a mechanism with which to harass or intimidate one another.").

"To allow individuals to avail themselves of first amendment protections when it is alleged that their conduct will lead to official misconduct in violation of the United States Constitution would defeat the purpose of the civil rights laws."

*LeBlanc–Sternberg v. Fletcher,* 781 F.Supp. 261, 267 (S.D.N.Y.1991). Even exercise of the right to petition may result in abuse actionable under section 1983.

## IV. LAW APPLIED TO FACTS

### A. Time Warner Has Stated Valid Counterclaims

 In order to prevail on its 12(b)(6) motion, Fox must establish that there exists no set of facts arguably supporting any of Time Warner's claims. Time Warner describes numerous overt acts by Fox and the City in execution of the claimed conspiracy designed to coerce a private entity to give up its rights because of the desire of public officials to reward and ingratiate themselves with a competitor. These cannot be characterized as "normal dealings" with the state. Time Warner alleges with sufficient particularity a collaboration between Fox and the City to deprive Time Warner of its Free Speech, Due Process, and other statutory rights.

 The only argument Fox offers in support of its motion is that all counterclaims are barred by the *Noerr–Pennington* doctrine. The decision about whether the *Noerr–Pennington* doctrine applies should be left until after discovery, so as to "more fully develop the underlying acts and possibly establish an exception...." *P. & B. Marina L.P. v. Logrande,* 136 F.R.D. 50, 61

n. 9 (E.D.N.Y.1991). Here the facts are not so clear, and the new discovery burdens of the counterclaims are not so heavy, as to warrant foreclosing the gathering of facts necessary for an appropriate conclusion of the litigation on the merits.

### B. Fox is Not Necessarily Protected by *Noerr–Pennington*

 Fox is correct in asserting that the "sham" exception does not apply, since the activity to which Time Warner objects was in fact aimed at procuring government action favorable to Fox. *See Hamilton v. Accu–Tek,* 935 F.Supp. 1307, 1317 (E.D.N.Y. 1996) (quoting *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 58, 113 S.Ct. 1920, 1927, 123 L.Ed.2d 611 (1993)). Fox, however, is not persuasive in its claim that its dealings with the City do not constitute corruption. Time Warner may rely for purposes of this motion on Judge Cote's finding that "[t]he City's purpose in acting to compel Time Warner to give Fox one of its commercial channels was to reward a friend and to further a particular viewpoint." *Time Warner Cable of New York City v. City of New York,* 943 F.Supp. 1357, 1400 (S.D.N.Y.1996). While Fox is not bound by Judge Cote's ruling, it cannot ignore Judge Cote's factual determination on a motion to dismiss under Rule 12(b)(6).

If Fox can be found to have conspired with the City, illegally violating Time Warner's First Amendment and statutory rights, its activity could be found to violate section 1983 and would not be protected by *Noerr–Pennington.* Taking Time Warner's allegations as true for the purposes of deciding this motion to dismiss, Time Warner has stated valid counterclaims.

## V. CONCLUSION

The motion to dismiss the counterclaims is denied without costs or disbursements.