[707 NYS2d 647]

Alfred Weissman Real Estate, Inc., Respondent-Appellant, v Big V Supermarkets, Inc., et al., Appellants-Respondents.

Second Department, May 8, 2000

## APPEARANCES OF COUNSEL

*Simpson Thacher & Bartlett,* New York City (*David J. Woll, Nancy L. Swift, Patrick E. King, Nina L. Rifkind* and *Robert F. Cusumano* of counsel), for Big V Supermarkets, Inc., appellant-respondent.

*Whiteman Osterman & Hanna,* Albany (*Philip H. Gitlen* and *David R. Everett* of counsel), for Matthew D. Rudikoff Associates, Inc., appellant-respondent.

*Cahill, Gordon & Reindel,* New York City (*P. Kevin Castel* of counsel), for Suburban Properties, Inc., appellant-respondent.

*Burke, McGlinn & Miele,* Suffern (*Patrick T. Burke* and *James Sweeney, pro se,* of counsel), for James Sweeney, appellant-respondent.

*Bleakley Platt & Schmidt,* White Plains (*William P. Harrington, Mark K. Malone* and *Helen M. Maher* of counsel), for respondent-appellant.

## OPINION OF THE COURT

S. MILLER, J.

The primary issue raised on this appeal pits fundamental rights to petition the government for private redress against the rights of a property owner to put its land to a reasonable commercial use. Specifically, we are asked to decide whether the plaintiff is entitled to recover damages and to obtain other relief as a consequence of the defendants' manipulation of the governmental process, the object of which was to prevent a business rival from gaining necessary approvals so as to preclude the rival from opening a competing business. Notwithstanding that such a goal appears to fly in the face of notions of fair play and free-market competition, where such object is

achieved through the governmental process, we hold that the plaintiff is not entitled to judicial relief.

## I

The plaintiff, Alfred Weissman Real Estate, Inc. (hereinafter Weissman), is a Yonkers-based real estate developer. In August 1995, Weissman entered into a conditional agreement with Saks Fifth Avenue (hereinafter Saks) to purchase a piece of property on Tuckahoe Road in Yonkers (hereinafter the site). For 15 years, the site had been occupied by a single warehouse. Weissman planned to develop a shopping center on the site and to lease space to retail tenants, including a supermarket. To accomplish this plan, Weissman had to obtain a change in the current zoning of the site from commercial to retail. According to Weissman, Tuckahoe Road in Yonkers has historically been a retail corridor. A strip mall, which contains a Staples store (and previously containing a Finast Supermarket) is immediately adjacent to the site. Weissman's agreement with Saks was contingent upon obtaining the zoning change.

The defendant Big V Supermarkets, Inc. (hereinafter Big V) sought to become the supermarket tenant at the site. Big V already operated a ShopRite supermarket on Tuckahoe Road, approximately one-half mile away from the site.

On October 10, 1995, Weissman's representatives met with Big V representatives to discuss Big V's interest in the site. According to Weissman, Big V wanted the site because it had greater parking capacity and was closer to Central Avenue, and it did not want a competing supermarket to lease space at the site. At this meeting, Weissman was allegedly warned that if it did not lease the site to Big V, the project would not get built.

On December 22, 1995, Big V submitted a formal lease proposal. Big V wanted Weissman to take a 50% interest in the ShopRite property that Big V already operated down the road. An agreement between the two could not be reached. Although Weissman determined that Big V had an inadequate credit rating to obtain the necessary financing, Big V refused to have its parent company, Wakefern Food Corporation, guarantee Big V's financial obligations.

In October 1996, Weissman entered into an agreement with Stop & Shop, a competitor of Big V, to lease the supermarket space at the site. Stop & Shop's parent company guaranteed the lease. On August 4, 1997, Weissman entered into an agreement with Target Stores for another portion of the site. Both of

these contracts were dependent upon Weissman obtaining a zone change of the site from commercial to retail.

In January of 1996, Weissman submitted its initial proposed zone change application for the site to the Yonkers City Council and embarked upon the SEQRA review process under the State Environmental Quality Review Act (ECL art 8 [hereinafter SEQRA]). In March 1996, Weissman submitted an amended petition.

At some point during the process, Big V hired the defendant Matthew D. Rudikoff Associates, Inc. (hereinafter Rudikoff), to "perform work related to a proposed commercial rezoning and retail center on Tuckahoe Road." Rudikoff's objective was "to extend the review process, to promote opposition efforts to delay or deny the project, and to document substantive and procedural flaws in support of either a project denial or potential litigation." In Weissman's words, Rudikoff's job was to derail its proposed commercial rezoning of the site.

Weissman charged that Big V and Rudikoff fabricated an entity, the defendant Suburban Properties, Inc. (hereinafter Suburban), as a corporate shell, in order to create standing to oppose the project. Weissman further alleged that the defendants also created the Association for the Preservation of Tuckahoe Road (hereinafter the APTR) and the Coalition to Protect the Grassy Sprain Neighborhoods (hereinafter the CPGSN). According to Weissman, the APTR was a neighborhood association headed by Albert Reitano, the manager of Big V's ShopRite store on Tuckahoe Road. The CPGSN was a neighborhood group formed to disseminate to the public pamphlets containing misleading and disparaging information about Weissman and the site. Weissman acknowledged that certain "legitimate" community groups also have opposed and/or commented on the project citing fears of increased traffic congestion, noise, pollution, and damage to neighborhood character.

In February 1997, Rudikoff submitted a letter to Vincenza Restiano, President of the Yonkers City Council, indicating that it was conducting an "independent review" of the project on behalf of APTR. Rudikoff stated that "the residents of the City of Yonkers are concerned with the effects of commercial development and congestion." It also commented on the proposed scope of issues to be addressed in the draft environmental impact statement (hereinafter DEIS) for the project, including the project's impact on traffic, air quality, and waste generation. In October 1997, Rudikoff submitted written comments on the DEIS, addressing, *inter alia,* traffic impacts. Such

issues were also raised by other members of the public and various agencies, including the Westchester County Planning Board and the New York State Thruway Authority (hereinafter Thruway Authority). Specifically, on February 5, 1997, the Westchester County Planning Board requested that the Traffic and Transportation section be expanded so as to require the study and analysis of all "signalized" intersections along the Tuckahoe Road corridor because of the impact that a project of this size may have. On February 28, 1997, the Tuckahoe Watchdog Group requested, *inter alia*, a traffic analysis of intersections along Tuckahoe Road, a noise analysis, and a detailed market study. On September 30, 1997, the Thruway Authority requested, *inter alia,* a queuing analysis and a traffic signal progression analysis.

Between February and April 1998, Rudikoff submitted several letters to the Yonkers Planning Board (hereinafter Planning Board) commenting on the final environmental impact statement and the proposed zone change, citing concerns about traffic.

On May 13, 1998, the Planning Board, although finding that Weissman's application was "handled extremely well and extremely professionally," voted 4 to 3 to disapprove its rezoning proposal, expressing particular concern with the impact of the proposed development on traffic conditions along Tuckahoe Road. The Planning Board found that the existing traffic problems along Tuckahoe Road warranted a denial of the project. The Board indicated that the City, County, and State could "arguably make significant improvements on Tuckahoe Road" and that "[t]hese improvements would then be in place" for future applicants. In response, Weissman submitted an amended proposal which offered to implement over $3,000,000 in traffic improvements on Tuckahoe Road to alleviate the potential traffic impacts which were identified. On July 9, 1998, the Planning Board expressed its concern over the proposal's impact on traffic conditions, but unanimously agreed to permit Weissman to make additional submissions regarding the mitigation of traffic problems. The Planning Board scheduled another meeting on this issue. Subsequently, the Yonkers City Council rejected Weissman's final economic impact statement as incomplete.

On July 16, 1998, Weissman commenced this action against Big V, Rudikoff, Suburban, and James Sweeney, the attorney for Big V, asserting five causes of action: (1) tortious interference with a contract, (2) tortious interference with prospective

economic advantage, (3) prima facie tort, (4) deceptive trade practices in violation of General Business Law § 349, and (5) a claim for declaratory and injunctive relief, enjoining the defendants from any further participation in the SEQRA review process and public hearings on its zone change application.

On or about July 23, 1998, Weissman moved, *inter alia,* for a temporary restraining order and to preliminarily enjoin the defendants from participating in any further public hearings on its application for a zone change. In response, the defendants cross-moved, *inter alia,* to dismiss the complaint for failure to state a cause of action. The defendants asserted, among other things, that their participation in the public review of Weissman's project was protected speech under the First Amendment of the United States Constitution and unobjectionable pursuant to the *Noerr-Pennington* doctrine (*see, Eastern R. R. Presidents Conference v Noerr Motor Frgt.,* 365 US 127; *United Mine Workers v Pennington,* 381 US 657). On or about September 17, 1998, while the motions were pending, and before the vote on Weissman's zone change application, Weissman voluntarily withdrew the application, without prejudice to renew. Weissman has not submitted a new application.

The Supreme Court granted those branches of the defendants' cross motions which were to dismiss the first two causes of action, but denied those branches of the cross motions which were to dismiss the three remaining causes of action. The defendants separately appeal, *inter alia,* from so much of the order as sustained the last three causes of action. Weissman cross-appealed from stated portions of the order, but has abandoned its cross appeal. On the separate appeals of the defendants, we modify and grant those branches of the defendants's respective cross motions which were to dismiss the remaining causes of action.

## II

The defendants argue, *inter alia,* that pursuant to the *Noerr-Pennington* doctrine, they cannot be penalized for, or prevented from, exercising their right to petition the government and comment on Weissman's zoning proposal. We agree.

The First Amendment guarantees "the right of the people * * * to petition the Government for a redress of grievances" (US Const, 1st Amend). In addition, the United States Supreme Court has held, under what has become known as the *Noerr-Pennington* doctrine, that citizens who petition the government

for governmental action favorable to them cannot be prosecuted under the antitrust laws even though their petitions are motivated by anticompetitive intent (*see, Eastern R. R. Presidents Conference v Noerr Motor Frgt.,* 365 US 127, *supra; United Mine Workers v Pennington,* 381 US 657, *supra*). For example, railroads that embark on advertising campaigns designed to convince the Legislatures to pass laws detrimental to the trucking industry are not subject to antitrust liability for those actions even though their ultimate goal is to drive truckers out of business and limit competition. Similarly, petitions made to the executive or judicial branches of government, e.g., in the form of administrative or legal proceedings, are exempt from antitrust liability even though the parties seek ultimately to impede their competitors through these actions. Although the *Noerr-Pennington* doctrine initially arose in the antitrust field, the courts have expanded it to protect First Amendment petitioning of the government from claims brought under Federal and State law, including claims asserted pursuant to 42 USC § 1983 and common-law tortious interference with contractual relations (*see, Video Intl. Prod. v Warner-Amex Cable Communications,* 858 F2d 1075, *cert denied* 491 US 906; *Hamilton v Accu-Tek,* 935 F Supp 1307, 1317).

Courts applying the *Noerr-Pennington* doctrine have concluded that the fact that the effort to influence government is part of a broader scheme does not make the conduct illegal (*see, United Mine Workers v Pennington, supra,* at 670; *Eastern R. R. Presidents Conference v Noerr Motor Frgt., supra,* at 139; *see also, City of Columbia v Omni Outdoor Adv.,* 499 US 365, 380; *Weiss v Willow Tree Civic Assn.,* 467 F Supp 803, 817; *Village Supermarket v Mayfair Supermarkets,* 269 NJ Super 224, 634 A2d 1381). In fact, courts have upheld the application of the doctrine even when the petitioning activity included the use of questionable or underhanded activity (*see, Eastern R. R. Presidents Conference v Noerr Motor Frgt., supra,* at 130; *see also, Gorman Towers v Bogoslavsky,* 626 F2d 607, 615; *Wheeling-Pittsburgh Steel Corp. v Allied Tube & Conduit Corp.,* 573 F Supp 833, 842).

### III

In order not to chill legitimate lobbying activities, it is important that a plaintiff's complaint contain specific allegations demonstrating that the *Noerr-Pennington* protections do not apply (*see, Boone v Redevelopment Agency,* 841 F2d 886, *cert denied* 488 US 965). Here, the following pertinent allega-

tions in Weissman's complaint were made: (1) that the defendants' activities were perpetrated to eliminate competition with Big V's Tuckahoe Road store, (2) that the defendants intended to harm Weissman in retaliation for its refusal to lease space at the site to Big V, and (3) that the defendants used deception, misrepresentation, and misinformation in furtherance of their negative campaign scheme.

Clearly the aforementioned allegations go to the very heart of the *Noerr-Pennington* doctrine. Indeed, the Supreme Court has recognized that attempts to influence public officials may occasionally result in deception of the public, manufacture of false sources of reference, and distortion of public sources of information; such deception, as reprehensible as it is, may be of no consequence because in the course of proceedings the falsity of the statements may be scrutinized and revealed (*see, Eastern R. R. Presidents Conference v Noerr Motor Frgt., supra,* at 140). Weissman failed to allege that the defendants' activities were perpetrated only for reasons other than legitimate petitioning of government, and thus, has not alleged conduct outside the protections of the *Noerr-Pennington* doctrine (*see, Boone v Redevelopment Agency,* 841 F2d 886, 894, *supra*).

Weissman's argument that the *Noerr-Pennington* doctrine is not available to the defendants herein because it is only applicable in disputes between competitors or to groups who are motivated by "higher civic principles" and who disclose their true identity, is without merit. The body of case law dealing with the *Noerr-Pennington* doctrine has regularly been applied in disputes involving parties other than business competitors (*see, e.g., Gorman Towers v Bogoslavsky,* 626 F2d 607, *supra* [dispute between developer and local landowners]; *Hotel St. George Assocs. v Morgenstern,* 819 F Supp 310 [dispute between hotel operator and local residents]; *Oregon Natural Resources Council v Mohla,* 944 F2d 531, *cert denied* 496 US 926 [dispute between developer and environmental group]). Furthermore, the *Noerr-Pennington* doctrine has been expanded to protect First Amendment petitioning of the government for claims brought under Federal and State law, regardless of the petitioners' motivation (*see, Video Intl. Prod. v Warner-Amex Cable Communications, supra,* at 1084; *see also, Weiss v Willow Tree Civic Assn., supra,* at 807; *Hotel St. George Assocs. v Morgenstern, supra; Metro Cable Co. v CATV of Rockford, Inc.,* 516 F2d 220, 227-228; *MCI Communications Corp. v American Tel. & Tel. Co.,* 708 F2d 1081, 1154-1155, *cert denied* 464 US 891).

Finally, contrary to Weissman's contentions, the defendants have the right to engage in petitioning activities under an assumed name or without disclosing their true identity (*see, McIntyre v Ohio Elections Commn.,* 514 US 334, 357; *Buckley v American Constitutional Law Found.,* 525 US 182).

## IV

That the challenged conduct is the type protected by the *Noerr-Pennington* rule does not end our inquiry. Such conduct may be excepted from protection in certain circumstances. The "sham" exception to the *Noerr-Pennington* doctrine comes into play when the party petitioning the government is not at all serious about the object of the petition, but does so merely to inconvenience its competitor, or to preclude or delay its competitor's access to governmental processes (*see, Fox News Network v Time Warner,* 962 F Supp 339). A party that petitions the government by engaging in administrative processes only to preclude or delay its competitor's access to those processes may be liable for antitrust damages under the "sham" exception (V*ideo Intl. Prod. v Warner-Amex Cable Communications, supra,* at 1082; *see also, California Motor Transp. Co. v Trucking Unlimited,* 404 US 508, 512). The "sham" exception to *Noerr-Pennington* encompasses situations in which persons use the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon (*see, City of Columbia v Omni Outdoor Adv.,* 499 US 365, 380, *supra*). A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license, but simply in order to impose expense and delay. A "sham" situation involves a defendant whose activities are not genuinely aimed at procuring favorable governmental action at all, not one who genuinely seeks to achieve his governmental result, but does so through improper means (*see, City of Columbia v Omni Outdoor Adv., supra; Eastern R. R. Presidents Conference v Noerr Motor Frgt., supra,* at 144).

Here, Weissman failed to allege that the defendants were not genuinely seeking official action from the Planning Board, allegations which are necessary to state a claim under the sham exception (*see, Franchise Realty Interstate Corp. v San Francisco Local Joint Executive Bd. of Culinary Workers,* 542 F2d 1076, 1080-1081, *cert denied* 430 US 940). Indeed, Weissman alleged that the defendants' actions were more than an attempt to directly injure a competitor since they had a real, i.e., economic, interest in the outcome.

Moreover, by definition, an objectively reasonable and ultimately successful effort to influence government action cannot be considered a sham (*see, Professional Real Estate Investors v Columbia Pictures Indus.,* 508 US 49, 58), and to the extent that the Planning Board's unfavorable May 1998 recommendation may be attributed to the defendants' activities, those activities are removed from the sham exception (*see, Gorman Towers v Bogoslavsky, supra,* at 615 [genuineness of defendants' lobbying effort is manifested by its success]; *Wilmorite, Inc. v Eagan Real Estate,* 454 F Supp 1124, 1135, affd 578 F2d 1372, *cert denied* 439 US 983).

Weissman's reliance on *Landmarks Holding Corp. v Bermant* (664 F2d 891) is misplaced, since in that case the defendants planned to litigate against their competitors zoning application, "regardless of the merits" and then appealed from each adverse decision, even when they knew they lacked standing. In addition, the defendants' attorneys improperly solicited and subsidized the landowners' meritless litigation, deliberately delayed them, and failed to relay a settlement offer which would have helped resolve the issue. In the end, after 14 actions brought by the various defendants, and numerous meritless appeals, the plaintiffs succeeded in obtaining everything they needed. Here, on the contrary, there has been no such abuse of the judicial process.

Moreover, the "corruption" exception, which applies only where a party has stepped beyond the bounds of zealous advocacy and engages in conduct alleged to be criminal, not just deceptive or unethical, is inapplicable here (*see, Cipollone v Liggett Group,* 668 F Supp 408, 410; *see also, Hamilton v Accu-Tek, supra,* at 1317). Weissman did not allege that the defendants participated in illegal, criminal activity directed at a government authority (*see, Fox News Network v Time Warner, supra,* at 345).

Finally, because Weissman no longer has an application pending before the Yonkers zoning authorities, its claims for declaratory and injunctive relief are not justiciable (*see, Lewis v City of Gloversville,* 246 AD2d 804; *Freedom of the Press v New Dealers Assn.,* 198 Misc 1084).

## V

As the foregoing clearly demonstrates, the defendants are shielded from liability by the *Noerr-Pennington* doctrine. The plaintiffs do not possess cognizable causes of action for what amounts to the defendants' mastery of the local political pro-

cess to protect their legitimate business interests. Thus, the complaint should have been dismissed in its entirety.

The parties' remaining contentions are without merit. Accordingly, the cross appeal is dismissed as abandoned, and, on the defendants' separate appeals, the order is modified by granting those branches of the defendants' respective cross motions which were to dismiss the third, fourth, and fifth causes of action, and the complaint is dismissed.

SULLIVAN, J. P., KRAUSMAN and H. MILLER, JJ., concur.

Ordered that the cross appeal is dismissed as abandoned; and it is further,

Ordered that the order is modified by deleting the provision thereof denying those branches of the defendants' respective cross motions which were to dismiss the third, fourth, and fifth causes of action insofar as asserted against them and substituting therefor a provision granting those branches; as so modified, the order is affirmed insofar as appealed from, and the complaint is dismissed; and it is further,

Ordered that the defendants are awarded one bill of costs.