People v Richmond Capital Group LLC (2023 NY Slip Op 50975(U))

[*1]

People v Richmond Capital Group LLC

2023 NY Slip Op 50975(U)

Decided on September 15, 2023

Supreme Court, New York County

Borrok, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 15, 2023
Supreme Court, New York County

The People of the State of New York, by Letitia James, 
 Attorney General of the State of New York, Petitioner,

against
Richmond Capital Group LLC, Ram Capital Funding LLC, Viceroy Capital Funding Inc. Also Doing Business as Viceroy Capital Funding and Viceroy Capital LLC, Robert Giardina, Jonathan Braun, Tzvi Reich, Michelle Gregg, Respondents.

Index No. 451368/2020

Plaintiffs by:
Office of the New York State Attorney General, 28 Liberty Street, New York, NY 10005
Defendants by:
Kravet & Vogel LLP, 555 Fifth Avenue, 14th Floor, New York, NY 10017
Meringolo Law, 375 Greenwich Street, 7th Floor, New York, NY 10013
Forchelli Deegan Terrana, 333 Earle Ovington Blvd, Suite 1010, Uniondale, NY 11553
The Law Offices of Thomas A Harvey PLLC, 9 Pheasant Rd W, Pound Ridge, NY 10576
Terenzi & Confusione PC, 401 Franklin Ave, Suite 304, Garden City, NY 11530
Baratta Baratta & Aidala LLP, 546 Fifth Avenue, 6th Floor, New York, NY 10036
Fleischmann PLLC, 150 Broadway, Suite 701, New York, NY 10038
Seddio & Associates, PC, 1 Metrotech Center, Suite 1803, Brooklyn, NY 11201
Schwartz Law PLLC, 150 Broadway, Room 701, New York, NY 10038
Aidala, Bertuna & Kamins, PC, 546 Fifth Avenue, New York, NY 10036
Deborah J Blum, Esq., 225 Broadway, Suite 715, New York, NY 10007

Andrew Borrok, J.

The following e-filed documents, listed by NYSCEF document number (Motion 011) 580, 581, 582, 583, 584, 585, 586, 587, 588, 589, 590, 591, 592, 593, 594, 595, 596, 611, 613, 614, 615, 616, 617, 618, 619, 620, 621, 622, 623, 624, 625, 626, 627, 628, 629, 630, 631, 632, 633, 634, 635, 636, 637, 638, 639, 640, 641, 642, 643, 644, 645, 646, 647, 648, 649, 650, 651, [*2]652, 653, 654, 655, 656, 657, 658, 659, 660, 661, 662, 663, 664, 665, 666, 667, 668, 669, 670, 678, 679, 680, 681, 682, 683, 684, 685, 686, 687, 688, 689, 690, 691 were read on this motion to/for MISCELLANEOUS.
The following e-filed documents, listed by NYSCEF document number (Motion 012) 598, 599, 600, 601, 602, 603, 604, 605, 607, 671, 672, 673, 674, 675, 676, 677, 702, 703, 704, 706, 715 were read on this motion to/for JUDGMENT - DEFAULT.
The following e-filed documents, listed by NYSCEF document number (Motion 013) 719, 720, 721, 722, 723, 724, 725, 726, 727, 728, 729, 730, 731, 732, 733, 734, 735, 736, 737, 738, 739, 740, 741, 742, 743, 744, 745, 746, 747, 748, 749, 750, 751, 752, 753, 754, 755, 756, 757, 758, 759, 760, 761, 762, 763, 764, 765, 766, 767, 768, 769, 770, 771, 772, 773, 774, 775, 776, 777 were read on this motion to/for INJUNCTION/RESTRAINING ORDER.
Upon the foregoing documents (and the supplemental submissions authorized by the Court), following an approximately seven-day hearing, and for the reasons set forth below, the Attorney General of the State of New York (the NY AG)'s amended petition (NYSCEF Doc. No. 426; the AP) is granted as set forth below.
Richmond Capital Group, LLC (RCG), Ram Capital Funding, LLC (Ram), Viceroy Capital Funding Inc. d/b/a Viceroy Capital Funding and Viceroy Funding Capital LLC, Robert Giardina, Jonathan Braun, Tzvi Reich, and Michelle Gregg (collectively, the Predatory Lenders) (i) are permanently enjoined from engaging in the fraudulent and illegal practices set forth in the AP, (ii) must cease all collection of payment or other monies related to the Loan Documents (hereinafter defined), (iii) must rescind all Loan Documents between any of the Predatory Lenders and any of the Borrowers (hereinafter defined), (iv) must promptly apply for vacatur of all confessions of judgment filed by them and all judgments issued in their favor in respect of such Loan Documents, (v) must file all papers sufficient to terminate all liens or security interests related to the Loan Documents, (vi) shall provide an accounting and a complete history of all monies collected or received from any Borrower since June 10, 2014,[FN1]
(vii) shall pay full restitution and damages which include the refund of all monies paid to the Predatory Lenders or their affiliates pursuant to or in connection with the Loan Documents, and (viii) must each pay $2,000 pursuant to CPLR 8303(a)(6). For the avoidance of doubt, and as discussed below, the remedies of recission and restitution do not include forfeiting principal that was not the property of the Borrowers prior to the time that the Loan Documents were consummated.
As discussed more specifically below, on the record before the Court, the NY AG has demonstrated that the Predatory Lenders are loan sharks who perpetrated a massive fraud on desperate merchants (the Borrowers) who were unable to obtain traditional financing for their businesses. The record includes (i) over 140 sample merchant cash advance agreements (each an MCA, and together collectively, the MCAs; each of which MCA contains materially the same terms as the other MCAs), (ii) the business records of Actum Processing LLC (the loan payment processing company; hereinafter, Actum), (iii) certain admissions from the individual Predatory Lenders, (iv) affidavits of certain of the individual Predatory Lenders (which affidavits were submitted at the direction of, or in concert with, other individual Predatory Lenders and without [*3]legitimate purpose and in furtherance of the fraud perpetrated by these Predatory Lenders [which affidavits are flatly contradicted by email admissions of the same individuals and other documentary evidence in the record]), and (v) certain affidavits of the Borrowers. The Predatory Lenders, acting in concert with each other (and, for a significant period of time, in fact, working out of the same physical office space right next to each other on the same transactions despite purportedly being part of different companies), also submitted false documents without legitimate purpose to various courts in furtherance of their illicit operation.[FN2]

The MCAs Were Loans and Not Legitimate Purchases of Accounts Receivable
There are no issues of fact that the MCAs were loans, not a legitimate purchase of accounts receivables (Blue Wolf Capital Fund II, L.P. v American Stevedoring, Inc., 105 AD3d 178, 182-183 [1st Dept 2013]). The Predatory Lenders made no secret of this. They advertised themselves as lenders making small business loans where "[m]ost loans are completed and money your business account within 48 hours" (NYSCEF Doc. No. 27, at 5). Indeed, according to Ram, "[a]s a private lender, Ram Capital Funding takes pride in investing in projects that traditional banks may deny or may take months to approve " (NYSCEF Doc. No. 28, at 2). Indeed, the risk of loss associated with ownership of the Borrower's account receivable never passed to the Predatory Lenders. Pursuant to the MCAs, the Borrowers were required to send bank statements to the Predatory Lenders (see, e.g., NYSCEF Doc. No. 9, at 1). Although the MCAs provided for mandatory reconciliation of the daily amounts collected with the amounts of accounts receivable actually received by the Borrowers following receipt of such bank statements—as if the transactions were sale transactions—this was a total sham (id.).
The Predatory Lenders either admit that mandatory reconciliation never occurred or invoke the Fifth Amendment privilege against self-incrimination (tr at 130, lines 17-20 [NYSCEF Doc. No. 456]; tr at 151-152, lines 21-18 [NYSCEF Doc. No. 583]; tr at 43-44, lines 23-2 [NYSCEF Doc. No. 584]; tr at 97, lines 14-18 [NYSCEF Doc. No. 585]).[FN3]
The business records of Actum also confirm that it never occurred (NYSCEF Doc. No. 783). These MCAs were always understood to be based on fixed payments over a fixed finite term. Indeed, the text message exchanges between Messrs. Braun and Reich (of RCG and Ram, respectively) confirm that Messrs. Braun and Reich, acting in concert, discussed and made deals based on the amount of time that their money would be outstanding — i.e., a fixed term where the daily payment sweep of the Borrower's bank accounts reflected fixed constant repayments over a fixed term, not based on any purported amount of receivables purchased (NYSCEF Doc. No. 150). Lastly, [*4]although the MCAs indicate that a Borrower's failure to make payments because it went bankrupt would not constitute a breach of, or default under, the MCAs (provided that no other breach occurred), this too was a sham. The Predatory Lenders made sure that their Borrowers were in default on Day 1 of the MCAs by requiring that the Borrowers falsely represent that the collateral (i.e., the accounts receivable) was free and clear of all other loans (see, e.g., NYSCEF Doc. No. 8, § 2.10) and that they would not pledge those assets to others (id., at 6). The Predatory Lenders knew this was false (NYSCEF Doc. Nos. 136, 699). The Predatory Lenders knew that their money was behind other lenders as to the pledged accounts receivable (NYSCEF Doc. No. 150, at 4 ["I care about 110 days in 5th or 6th"] [emphasis added]). The Addendum to the MCAs also makes clear that a few missed payments constituted a default (see, e.g., NYSCEF Doc. No. 8, at 9 ["NSF Fee Standard - $50.00 (each) up to THREE TIMES ONLY before a default is declared"] [emphasis in original]; see also NYSCEF Doc. No. 699).[FN4]
Additionally, Section 2.9 of the MCAs makes clear that any encumbrance of the collateral would make the full amount immediately due and payable and that the Predatory Lenders could enforce the personal guaranties that they required the Borrowers to provide. Thus, bankruptcy never relieved the Borrowers or the guarantors of their obligation under the MCAs or the guaranties. Inasmuch as missed payments constituted a default (and given that based on missed payments, Mr. Braun called a default and instructed his co-conspirators to file Confessions of Judgment based on such payment defaults against the individual guarantors), it does not matter that the individual guarantors' guaranty of their business' MCA was a guaranty of performance and not of payment. The record makes clear that the Predatory Lenders made sure that they were getting repaid no matter what and that the risk of actual ownership of the accounts receivable never passed to the Predatory Lenders.
The Loans Were Usurious
There are no issues of fact that these Loans were usurious. Indeed, in one case interest of over 3000% was charged (NYSCEF Doc. No. 108). There is no evidence in the record that any of the massive fees charged were legitimate, such that these fees must be characterized as interest (which fees and other upfront costs the Predatory Lenders had falsely advertised did not [*5]exist).[FN5]
But even if the fees and upfront costs were not recharacterized as interest (as they should be), these Loans were criminally usurious by charging interest at a rate far above the legal limit.[FN6]

The Predatory Lenders Engaged in Fraudulent and Illicit Conduct
There are no issues of fact that the Predatory Lenders engaged in fraudulent and illicit conduct in violation of New York State law. Although the Predatory Lenders' advertising leaves no doubt that they were lenders, not all of their advertising was true. By way of example, to entice would-be Borrowers to do "business" with them, they indicated that there were "no application fees" and "no upfront costs" (NYSCEF Doc. No. 27, at 3). As indicated above, this was false. The Addendum to the MCAs sets forth a comprehensive fee schedule.[FN7]
In addition, the amount actually funded to the Borrowers was not the full amount that was "purchased." It was also false that there would be a daily sweep of the pledged accounts based on an estimated percentage of collected receivables — the so-called "Specified Percentage." The MCAs required the Borrowers to deliver bank statements by the eighteenth of every month, and the merchants 
were required to perform a reconciliation of the amounts collected based on an estimated percentage of accounts receivable and the amounts of accounts receivable actually received (see, e.g., NYSCEF Doc. No. 9, at 1). Monthly reconciliation never occurred. As discussed above, the Predatory Lenders do not deny this (tr at 130, lines 17-20 [NYSCEF Doc. No. 456]; tr at 151, lines 8-13, at 151-152, lines 21-18 [NYSCEF Doc. No. 583]; tr at 43-44, lines 23-2 [NYSCEF Doc. No. 584]; tr at 97, lines 14-18 [NYSCEF Doc. No. 585]), and Actum's business records confirm this as well (NYSCEF Doc. No. 783). The record also firmly establishes that the daily [*6]sweeps of the Borrowers' accounts were based on a fixed amount and not based on the "Specified Percentage." Some agreements even left blank the space for a "Specified Percentage" in the form MCA agreement and therefore made no attempt whatsoever to hide the fact that it was a loan requiring fixed payments over a fixed term (see, e.g., NYSCEF Doc. No. 8, at 1).
As discussed above, the Predatory Lenders also charged the fees set forth in the Addendum to the MCAs despite advertising on their websites that there were no such fees. More specifically, certain of the fees were provided for in the Addendum as being either a set amount or a percentage of the principal amount advanced so that when the Borrowers signed the MCAs they could not have known how much they would be charged (see, e.g., NYSCEF Doc. No. 8, at 9 ["ACH Program Fee - $1,999.000 (or 12% of the funded amount, depending on size of advance"]). Worse still  even when the fees were stated in the MCAs, the Predatory Lenders often charged fees in excess of the amounts set forth in the MCAs. For example, one Borrower's MCA listed an ACH fee of $4,999 (NYSCEF Doc. No. 175, at 11), but Mr. Braun instructed Mr. Giardina, his "boss," to charge an ACH fee of $34,999 (id., at 1).
The Predatory Lenders also committed fraud by collecting more from the Borrowers than they were entitled to collect. This overcollection occurred in three ways: (i) by collecting interest payments on holidays when they were not entitled to collect anything,[FN8]
(ii) by collecting more than the "Specified Percentages" set forth in the MCAs,[FN9]
and (iii) by, on some occasions, debiting interest payments from Borrowers even after the loans were fully repaid.[FN10]

The massive fraud perpetrated by the Lenders also included submitting false affidavits to courts in support of Confessions of Judgments that they filed upon a Borrower default based on non-payment. There are no issues of fact as to whether the affidavits were perjurious or done without legitimate purpose. To wit, these affidavits, filed by Messrs. Reich and Giardina and Ms. Gregg, and at the direction of Mr. Braun, knowingly contained false statements about the MCAs, Security Agreements and Guaranties (collectively, the Loan Documents) so that the Predatory Lenders could obtain judgments and collect amounts to which they had no legal right of entitlement as such funds were criminally usurious interest amounts or otherwise fraudulently obtained fees. Among other things, in these perjurious affidavits, the Predatory Lenders falsely claimed that the Borrowers had made payments based on the "Specified Percentage" set forth in the Loan Documents. They had not. The Predatory Lenders had made daily sweeps where these [*7]daily sweep payments were not based on a percentage of receivables — i.e., the "Specified Percentage" and where no attempt was made (as required) to reconcile such daily sweeps to ensure that amounts debited from the Borrowers accounts were based on the collected accounts receivable.[FN11]

The Loan Documents are Unconscionable
The NY AG has also proved that the Loan Documents are procedurally and substantively unconscionable and that there are no issues of fact warranting any further evidentiary proceeding. As discussed above, these Borrowers were cash-strapped merchants who were unable to obtain additional traditional financing. The Predatory Lenders' advertising was directly geared to them — as borrowers who had already been turned down elsewhere (NYSCEF Doc. Nos. 27 and 28). These Borrowers had little to no bargaining power, and the Predatory Lenders knew that and preyed on it. The process was entirely flawed. As discussed above, the relationship was forged based on a series of false representations set forth on the Predatory Lenders' websites. They advertised themselves as lenders and then required the merchants to execute MCAs in attempt to disguise their usurious loans. The Borrowers knew that these were loans (see, e.g., NYSCEF Doc. No. 92, ¶ 8; NYSCEF Doc. No. 98, ¶ 3; NYSCEF Doc. No. 105, ¶ 3). They expected that there were going to be no upfront fees or charges and that missed payments would not cause a default. All of these representations were false. As discussed above, worse still — the MCAs were fully executed by the Borrowers prior to agreement being reached on all material terms. By way of example, as discussed above, the MCAs provide for payment of an ACH Program Fee in the amount of a certain dollar amount or up to a certain percentage of the amount funded (see, e.g., NYSCEF Doc. No. 8, at 9 ["ACH Program Fee - $1,999.00 (or 12% of the funded amount, depending on the size of the advance)"]). Following execution of these agreements locking in the Borrowers, the Predatory Lenders would have a "funding call" where they would finally disclose the true amount of the fees and disclose the final agreed upon amount that would actually be funded (based on inappropriate fee deduction) which thereby increased the interest rate charged to the Borrowers. This often was substantially different than what the Borrowers expected (a $499 stated fee could become as high as $2999 [see, e.g., tr of M.T. Pennington, at 62-63, lines 16-15 (NYSCEF Doc. No. 623)]). As discussed above, these agreements were also substantively unconscionable. The interest rate far exceeded the legal limit of 25% for criminal usury (NY Penal § 190.40).
[*8]There Is No Statute of Limitations Bar
The claims are not barred by the statute of limitations. Pursuant to CPLR 213(9), the statute of limitations on a case brought by the NY AG pursuant to Executive Law § 63(12) is six years. CPLR 213 was amended in 2019 to add subsection 9, and the Appellate Division has determined that this provision applies retroactively (People by James v JUUL Labs, Inc., 212 AD3d 414, 416-417 [1st Dept 2023]; People by James v Trump, 217 AD3d 609, 611 [1st Dept 2023]). This case was commenced on June 10, 2020, and the claims are therefore timely as to MCAs entered into as of June 10, 2014.
The Borrowers were Harassed and Bullied by Mr. Braun, RCG and Ram but not the other Predatory Lenders
Finally, the NY AG has proved that Mr. Braun harassed and bullied the Borrowers. There are no issues of fact that Mr. Braun, without legitimate purpose, and only to collect on his illicit loans and with the intent to harass otherwise, engaged in a course of conduct designed to seriously alarm the Borrowers (NY Penal § 240.26[1], [3]). Six Borrowers submitted affidavits explaining that Mr. Braun screamed at them and threatened them and their families with physical violence (NYSCEF Doc. No. 76, ¶¶ 24-27). One Borrower (of Ram) testified that, after he asked for a suspension of payments until customers paid outstanding invoices, Mr. Braun threatened him with violence, including by saying "Be thankful you're not in New York, because your family would find you floating in the Hudson" (NYSCEF Doc. No. 92, ¶ 45). Other Borrowers testified that Mr. Braun similarly harassed and threatened them (NYSCEF Doc. No. 52, ¶¶ 19-21 ["You don't know who you're f***ing dealing with"]; NYSCEF Doc. No. 55, ¶¶ 21-23 ["We will take everything from you" and "We'll take care of you and your family"]; NYSCEF Doc. No. 68, ¶ 22 ["I will kill you"]; NYSCEF Doc. No. 86, ¶ 29 ["We know where you live" and "We'll go after your family"]; NYSCEF Doc. No. 144, ¶¶ 30, 41 ["Do you know who I am?...I am going to come down there and beat the shit out of you" and "I am going to make you bleed. You are going to regret the day you met me"]; NYSCEF Doc. No. 272, ¶ 35 ["dumb-shit, f**khead").
Although Mr. Reich could not recall if he heard Mr. Braun threatening physical violence, he conceded that he personally had heard Mr. Braun scream at "his" Ram customers in collection calls, and he otherwise testified that Mr. Braun's conduct hurt his "business" relationships. He also conceded that he did nothing to stop him (tr at 255-261, lines 9-16 [NYSCEF Doc. No. 456]).[FN12]
The other individual Respondents invoked their Fifth Amendment privilege against self-incrimination (tr at 79, lines 2-16 [NYSCEF Doc. No. 584]; tr at 137-139, lines 21-6 [NYSCEF Doc. No. 585]). Although Mr. Braun denies all of this in his otherwise false self-serving affidavit, under the circumstances, this does not create an issue of fact warranting further proceedings as against him, RCG or as against Ram (as the record firmly [*9]establishes that he acted with authority on behalf of both RCG and Ram such that his conduct is imputed to them).
As to the other Predatory Lenders, however, the NY AG has only proved that certain of the Predatory Lenders were aware of Mr. Braun's conduct, but there is no evidence in the record that any of these other Predatory Lenders took affirmative steps to assist Mr. Braun so as to warrant further Executive Law § 63(12) proceedings based on harassment against them. Accordingly, the AP is denied and dismissed against them solely to the extent it seeks to hold them responsible for harassment.
Discussion
This is a special proceeding brought by the NY AG pursuant to Executive Law § 63(12) as against the Predatory Lenders. Pursuant to New York Executive Law § 63(12), the NY AG may bring a special proceeding for injunctive relief, restitution, and damages where a person or business engages in repeated or persistent fraud or illegality. The statute is to be liberally construed to achieve its intended purpose (People v Greenberg, 95 AD3d 474, 483 [1st Dept 2012], affd 21 NY3d 439 [2013]). The statute defines fraud to include "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions." It also defines persistent fraud or illegality to include "continuance or carrying on of any fraudulent or illegal act or conduct." Finally, it defines the term "repeated" to include "repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person." The test for fraudulent conduct is whether the alleged fraudulent act has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud (People v General Elec. Co., 302 AD2d 314, 314 [1st Dept 2003]). The AG need not establish intent or reliance to establish liability for fraud (People v Trump Entrepreneur Initiative LLC, 137 AD3d 409, 417 [1st Dept 2016]).
A motion for a summary determination requires application of the same standards applied on a motion for summary judgment (People v Northern Leasing Sys., Inc., 193 AD3d 67, 74 [1st Dept 2021]). The AG must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]). Once that showing has been made, the Predatory Lenders bear the burden to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact requiring trial (id.). They have repeatedly failed to do this.
I. The Transactions were Loans
In determining whether a transaction is a usurious loan, the transaction must be looked at in its totality and judged by its real character, rather than by the name or form which the parties give it (Abir v Malky, Inc., 59 AD3d 646, 649 [2d Dept 2009]). It must appear that the real purpose of the transaction was, on the one side, to lend money at usurious interest reserved in some form by the contract and, on the other side, to borrow upon the usurious terms (id.). Courts must look not to the form of the transaction, but to its substance or real character (Blue Wolf, 105 AD3d at 183). A transaction is not a loan unless the obligation to repay the principal sum is absolute — i.e., where the risk of ownership has passed to the funder (LG Funding, LLC v United Senior Properties of Olathe, LLC, 181 AD3d 664, 666 [2d Dept 2020]; cf. Spin Capital, LLC v Golden Foothill Ins. Services, LLC, 2023 WL 2265717 [Sup Ct, NY County 2023]). In determining whether the obligation to replay is absolute, the Courts look at the following three factors: (i) whether there is a reconciliation provision in the agreement, (ii) whether the [*10]agreement has a finite term, and (iii) whether there is any recourse should the merchant declare bankruptcy (LG Funding, 181 AD3d at 666).
As discussed above, all factors lead to the inescapable conclusion that the MCAs were loans. There are no issues of fact to the contrary. Although the MCAs had a mandatory reconciliation process, as discussed above, both Messrs. Reich and Braun conceded that the mandatory reconciliation never occurred (tr at 130, lines 17-20 [NYSCEF Doc. No. 456]; tr at 151-152, lines 21-18 [NYSCEF Doc. No. 583]), the other individual Respondents invoked their Fifth Amendment protection against self-incrimination (tr at 43-44, lines 23-2 [NYSCEF Doc. No. 584]; tr at 97, lines 14-18 [NYSCEF Doc. No. 585]), and the processing records of Actum also confirm that this never occurred (NYSCEF Doc. No. 783). It does not matter that the MCAs also provided for permissive reconciliation where the Borrowers could request reconciliation. The Predatory Lenders required the Borrowers to submit their bank statements each month and thus knew the amount of receivables actually collected (see, e.g., NYSCEF Doc. No. 9, at 1) and never made any adjustments based on those collected receivables. As discussed above, the record firmly establishes that these MCAs were negotiated and understood to be based on a fixed term with a fixed repayment schedule. The Predatory Lenders advertised themselves as lenders (NYSCEF Doc. No. 27, at 5; NYSCEF Doc. No. 28, at 2), the merchants understood these arrangements to be loans (see, e.g., NYSCEF Doc. No. 92, ¶ 8; NYSCEF Doc. No. 98, ¶ 3; NYSCEF Doc. No. 105, ¶ 3), and Messrs. Braun and Reich exchanged text messages discussing the arrangements based on the amount of time that their money would be loaned to the Borrowers (NYSCEF Doc. No. 150). Finally, and as discussed above, given the default provisions in the MCAs (including that missed payments per the Addendum did cause a default) and that the Predatory Lenders ensured that each Borrower was in breach of the MCA upon execution, the Borrowers and their Guarantors remained liable for repayment in the event of bankruptcy. Accordingly, the MCA were loans, not sales.
II. The Loans were Usurious and New York Law Applies to the Loans
In Executive Law § 63(12), the New York Legislature authorized the NY AG to apply New York law to investigate and enjoin transactions that had certain connections with this State. The statute evinces a strong public policy choice in support of New York law under certain defined circumstances emanating from New York law relating to financial consumer-related transactions. The Predatory Lenders attempt to avoid Executive Law § 63(12) by recharacterizing this action in various ways so as to avoid the specific choice of law decision made by the Legislature when it empowered the NY AG to pursue certain types of investigations and to enjoin certain types of fraudulent or other improper conduct. These attempts at avoiding the plain language and effect of Executive Law § 63(12) fail.
Relying primarily on the United States District Court for the Southern District of New York's decision (Rakoff, J.) in Haymount Urgent Care PC v. GoFund Advance, LLC, 2023 WL 5221901 (SD NY 2023), the Predatory Lenders argue that this Court can not find that they violated the usury laws because, they argue, this case stands for the proposition that a usury determination necessarily requires an individual choice of law analysis for each MCA.
More specifically, the Predatory Lenders argue that inasmuch as the NY AG has adduced only 140 MCAs, the Court can not make a finding that the Predator Lenders violated the applicable usury laws as to MCAs which are not adduced by the NY AG in support of its amended petition — i.e., the Court can not review a sample of the MCAs and make a finding as to all of the Predatory Lenders' MCAs. In addition, the Predatory Lenders argue that the Court [*11]cannot find that the MCAs are usurious without doing a choice of law analysis for each individual MCA. Thus, the Predatory Lenders argue that the NY AG has either failed to prove that the MCAs are usurious or there are at least issues of fact as to which MCAs are usurious and the NY AG is not entitled to (i) a complete accounting of all MCAs entered into by the Predatory Lenders or companies they owned and controlled, (ii) disgorgement (including return of all fees collected), and (iii) an injunction requiring that the Predatory Lenders and their affiliates be (x) prevented from entering into any new MCAs, (y) prevented from taking any action to enforce existing MCAs, and (z) required to prepare and file all documents necessary to vacate any confessions of judgment entered on behalf of such Predatory Lenders and their affiliates at their sole cost and expense. 
The Predatory Lenders misunderstand New York law. This is an action brought pursuant to Executive Law § 63(12). It is not a potential private putative class action brought by a lead merchant on behalf of others purportedly similarly situated (or a single merchant challenging its own MCA without the benefit of discovery and the substantial evidentiary record before this Court), and the issue before this Court is not whether Article 9 can be satisfied for class certification or whether the individual agreements can be set aside by those merchants or a merchant. The issue here is whether the Predatory Lenders violated the laws of the State of New York made applicable to their conduct as to all the MCAs by a statute empowering the NY AG with specific authority to apply New York law to this conduct. As discussed above, unquestionably and beyond any doubt, the Predatory Lenders did violate New York law. 
Executive Law § 63(12) gives the NYAG the power to investigate and enjoin behavior including "repeated fraudulent or illegal acts or persistent fraud or illegality in the carrying on, conducting or transaction of business." Rather than attempt to consolidate into the statute all the various common law and statutory bases for "fraudulent or illegal acts," the Legislature created as to the NY AG only a specific New York center of gravity test for the types of acts to which the NY AG may apply New York law as part of enjoining certain behaviors which the Legislature determined implicate strong and longstanding New York public policies as embodied in New York law.
Here, the NY AG has shown fraudulent conduct and usurious contracts solicited from and advertised in and/or from New York State. The law does not require that every single instance of illicit conduct be proven by the NY AG. What is required is that the NY AG must prove repeated fraudulent or illegal acts or persistent fraud in the carrying on of a business. The substantial sampling of the 140 agreements adduced by the NY AG is then supplemented by the admissions and other misconduct by the individual Predatory Lenders shown in the record and therefore more than satisfies the NY AG's burden of proof. As discussed above, the Predatory Lenders have failed to raise any issues of fact in their opposition papers.[FN13]

As to the choice of law concern, the Predatory Lenders again are confusing this action [*12]with a private lawsuit. Executive Law § 63(12) enunciates a clear standard under which the NY AG gets to apply New York law to certain conduct that has specific connections to New York State. Among other things, under this statute, New York's fraud laws can be applied by the NY AG to the conduct of New York residents in the State of New York, and New York's law of usury may be applied to those residents and their transactions without renvoi to the law of a competing state.[FN14]
 New York has a strong public interest in allowing its NY AG to apply New York law to certain designated conduct (especially conduct with specific New York connections) and in having New York remedies available to address any such conduct which violates New York law—a strong and well-enunciated public interest completely in keeping with the conflict of laws principles routinely applied by the Court of Appeals and the First Department. It also should be noted that the Legislature made no mention of renvoi applying to the NY AG's enforcement actions, and there is no basis at law or in the legislative record for this Court to impose a requirement not fashioned by the Legislature.
Thus, it does not matter that many of the Borrowers under these MCAs operated in certain other jurisdictions. It is not the Borrowers who challenge these agreements. It is the NY AG who is challenging the conduct of New York residents which took place in New York, and the NY AG is seeking to prevent those New York residents from keeping the spoils of fraud and otherwise illegal conduct. The fact that the NY AG intends to turn over the ill-gotten money back to the merchants does not change this result.
Thus, as summarized above, it is the State of New York, not a private litigant, that seeks to void these contracts and to do so based on a 'center of gravity' that is defined by New York state law — Executive Law § 63(12). The Haymount Court had no cause to consider Executive Law § 63(12) and, as such, it is inapposite to this case. As discussed above, the Predatory Lenders' actions placed these MCAs in New York under New York law with respect to the State of New York as plaintiff seeking to void these contracts. For purposes of the State of New York's remedial rights, New York is the center of gravity for these MCAs entered into by these Predatory Lenders.[FN15]

A lender commits civil usury when it loans money at an annual interest rate above 16% (NY Bank § 14-a[1]; NY Gen Oblig § 5-501[1]). A lender commits criminal usury when it loans money at an annual interest rate above 25% (NY Penal § 190.40). A criminally usurious contract is void (Blue Wolf Capital Fund II, L.P. v American Stevedoring Inc., 105 AD3d 178, 182 [1st Dept 2013]).
As set forth in the expert affidavit of Chansoo Song and various court decisions (NYSCEF Doc. No. 50, ¶ 12), the formula to calculate the applicable interest rate is (A/P)/(T/M) [*13]where A is interest amount, P is the principal amount, T is the number of days in the term, and M is the number of business days in a year. For the purposes of Mr. Song's. analysis, he used 251 business days. As discussed extensively during the hearing, (without recharacterizing the fees as interest which would in fact be appropriate in this case as the fees were additional interest payments) (Stransky v DiPalma, 137 AD3d 1734, 1736 [4th Dept 2016]), the MCAs in this case were criminally usurious. For example, one loan had an interest amount of $9,980, a principal amount of $20,000, and a term length of 50 days (NYSCEF Doc. No. 9). Using the above formula, the interest rate for this loan was 250%.[FN16]
 Another loan had an interest amount of $9,980, a principal amount of $20,000, and a term length of 75 days (NYSCEF Doc. No. 145). Using the same formula, this loan had an interest rate of 169%. A third loan had an interest amount of $9,900, a principal amount of $10,000, and a term length of 9.95 days. The interest rate on this loan was 2496%. Inasmuch as the interest charged by the Respondents was criminally usurious, the MCAs are void. 
III. The Predatory Lenders committed Fraud and as such the MCAs are Void
The test for fraudulent conduct is whether the alleged fraudulent act has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud (General Elec. Co., 302 AD2d at 314). The NY AG need not establish intent or reliance to establish liability for fraud (Trump Entrepreneur Initiative LLC, 137 AD3d at 417).
As discussed above, the NY AG has proved that this was never intended to be a sale of receivables and that the Predatory Lenders committed fraud by having their Borrowers enter into MCAs to hide in plain sight the usurious nature of the "business" deal. As discussed above, the Predatory Lenders also committed fraud by deceiving the Borrowers into believing that these loans carried no upfront fees or costs (NYSCEF Doc. No. 27, at 5; NYSCEF Doc. No. 28, at 2), and the Predatory Lenders further misled the Borrowers at the time that the Borrowers executed the MCAs into believing that fees would be at a particular level only to find out after they were signed up and committed to these illicit arrangements that the fees would be substantially different on the subsequent "funding call." The Predatory Lenders also overcharged the Borrowers by (i) collecting payments on holidays when they were not entitled to collect, (ii) collecting more than the specified percentages as set forth in the MCAs, and (iii) debiting payments from Borrowers even after the MCAs were fully repaid.[FN17]
This too constitutes fraud.
The Predatory Lenders committed additional counts of fraud by filing false affidavits with various courts to obtain entry of confession of judgments in support of their illicit [*14]agreements.[FN18]
 The filing of these false affidavits also is not protected by the Noerr-Pennington Doctrine. The Noerr-Pennington Doctrine protects the First Amendment right of petitioning the government regardless of the fact that the false statements may have been known to be false when made; however, where there is no genuine interest in seeking government action, the "sham" exception applies, and any such conduct is not protected (see Alfred Weissman Real Estate v Big V Supermarkets, 268 AD2d 101, 106-107 and 109-110 [2d Dept 2000]). As discussed above, the Predatory Lenders were engaged in fraudulent and illicit conduct, and the submissions of these false affidavits were a step in furtherance of their scheme where they had no genuine legitimate interest in the first instance. Thus, the "sham" exception applies, and the Predatory Lenders are not entitled to Noerr-Pennington protection.
For completeness, the Court also notes that Ms. Gregg's "Nuremberg"-like defense that she was only following Mr. Braun's orders (tr at 267-268, lines 19-10 [NYSCEF Doc. No. 794])[FN19]
 and that she can not be held liable for her participation in the Predatory Lenders' conduct is both wrong and belied by the record. She is being held responsible for her own conduct, and the record firmly establishes that Ms. Gregg knew exactly what she was doing. She knew that these were illicit loans from the time that they were negotiated (e.g., NYSCEF Doc. Nos. 108, 202, 204), she had direct interaction with the Borrowers (e.g., NYSCEF Doc. No. 55, ¶ 17; NYSCEF Doc. No. 68, ¶ 13), she also handled the processing of payments with Actum (tr at 316, lines 2-8 [NYSCEF Doc. No. 794]) and, as such, knew and acted in concert with Mr. Braun and the other Predatory Lenders to cause payments to be processed based on a fixed amount over a fixed term at criminally usurious rates and not based on any feigned "Specified Percentage" of collected accounts receivables. As discussed above, ultimately, she knowingly committed perjury by submitting false affidavits to ensure that confessions of judgment were entered by various courts in furtherance of the Predatory Lenders' massive fraud and without legitimate purpose. Thus, the MCAs are void.
IV. The Loans are Procedurally and Substantively Unconscionable and are Void
A determination of unconscionability requires a showing that the contract was both procedurally and substantively unconscionable when made — i.e., an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party (Kaufman v Relx Inc., 211 AD3d 580, 581 [1st Dept 2022]). Procedural unconscionability looks to the circumstances at the time the agreement was entered into, including the commercial setting, whether deceptive or high-pressured tactics were employed, whether a party had a reasonable opportunity to understand the terms of the [*15]agreement, which party drafted the contract, whether fine print was used as to material terms, whether there was an alternative for the services in question, the experience of the parties, and any disparity in bargaining power (id.).
As discussed above, the NY AG has proved that the MCAs are both procedurally and substantively unconscionable and not enforceable. The Predatory Lenders' advertising was geared to and targeted Borrowers who were cash strapped, could not obtain traditional funding, and who may have previously defaulted such that finding a financing source that did not look to their lending history was their only resort (NYSCEF Doc. Nos. 27 and 28). The Predatory Lenders required that the Borrowers sign the Loan Documents that they drafted before the time that the Predatory Lenders disclosed how much they would actually fund (which was generally much less than the loan amount — or the stated amount of receivables "purchased") and what the amount of the fees actually were. In fact, it was not until the "funding call" where Mr. Braun would disclose how much extra he was going to extract from the Borrowers by upping the fees and lowering the amount of money he actually funded. In addition, as discussed above, the Loan Documents themselves were a complete cover-up. The parties understood that this was a lending transaction, yet the documents were intentionally designed to disguise the true nature of the transaction. The Loan Documents were also intentionally misleading, designed to further disguise the real terms of this "deal." By way of example, the MCAs include precatory language that the transaction was "not a loan." It was, and the parties knew that it was. The MCAs provide that bankruptcy or a slowdown was not a default if the Borrower was not otherwise in default. As discussed above, this too was false and misleading. The Predatory Lenders required the Borrowers to be in default on Day 1 by requiring that they represent that the accounts receivable had not been pledged to anyone else while knowing that the representation was not true. Also as discussed above, per the Addendum, missing payments cause the Borrower to incur fees and missing a few payments caused an event of default. As discussed above, with respect to substantive unconscionability, the Predatory Lenders charged criminally usurious interest. Thus, the record firmly establishes both procedural and substantive unconscionability, the Predatory Lenders have failed to raise an issue of fact warranting further proceeding, and the MCAs are void.[FN20]

V. Mr. Braun, RCG and Ram harassed the Borrowers but the other Predatory Lenders did not
A person is guilty of harassment in the second degree when they, with the intent to harass, annoy or alarm another, among other things, threaten to subject another person to physical contact or engage in a course of conduct which alarm or seriously annoy another and [*16]which serves no legitimate purpose (NY Penal § 240.26[1], [3]). A person is guilty of aggravated harassment in the second degree when they, with the intent to harass another, communicate by telephone or other form of communication a threat to cause physical harm to a person or member of their family or household and reasonably should know that such communication would cause that person to fear such harm, or when then make a telephone call with the intent to harass or threaten with no purpose of legitimate communication (NY Penal § 240.30[1][a], [2]).
As discussed above, six victim Borrowers (of both RCG and Ram) testified that they were harassed by Mr. Braun and that he threatened them and/or their family with physical violence (NYSCEF Doc. No. 76, ¶¶ 24-27; NYSCEF Doc. No. 92, ¶ 45; NYSCEF Doc. No. 52, ¶¶ 19-21; NYSCEF Doc. No. 55, ¶¶ 21-23; NYSCEF Doc. No. 68, ¶ 22; NYSCEF Doc. No. 86, ¶ 29; NYSCEF Doc. No. 144, ¶¶ 30, 41; NYSCEF Doc. No. 272, ¶ 35). Although Mr. Braun's demonstrably perjurious affidavit (he was not just the underwriter) denies that these conversations ever took place or that he ever made such threats (NYSCEF Doc. No. 676, ¶¶ 7, 16), Mr. Reich's testimony corroborated the essential elements of harassment — i.e., that he often heard Mr. Braun scream at his clients without legitimate purpose and in a manner designed to alarm them and which did exactly that. Indeed, according to Mr. Reich, Mr. Braun's conduct was so egregious that it damaged Mr. Reich's "business" relationships with these victim Borrowers. Thus, there are no issues of fact warranting additional proceeding, and it does not create an issue of fact that Mr. Reich did not recall whether he heard the specific threats of violence that certain victim Borrowers testified to as having occurred. Inasmuch as the record clearly demonstrates that Mr. Braun had authority to bind RCG and act on behalf of Ram, RCG and Ram are also responsible for Mr. Braun's harassment.[FN21]

As to the other Predatory Lenders, however, the NY AG has only proved that certain of them were aware of Mr. Braun's conduct, but there is no evidence in the record that any of these other Predatory Lenders took any affirmative steps — as the statute appears by its plain terms to require — to assist Mr. Braun or engage in harassment themselves. Accordingly, the AP is denied and dismissed as against the other Predatory Lenders solely to the extent the AP seeks to hold them responsible for harassment.
VI. Remedies
Having proven that the MCAs and the Loan Documents were criminally usurious loans, the Predatory Lenders engaged in a massive fraud, and that the Loan Documents are both procedurally and substantively unconscionable, the NY AG is entitled to recission and restitution.
Rescission is an equitable remedy available to the NY AG in a case brought pursuant to Executive Law § 63(12) in order to restore the status quo (People v Coventry First LLC, 13 NY3d 108, 113-114 [2009]). Executive Law § 63(12) also authorizes restitution and damages [*17]for victims of fraudulent and unlawful conduct, and such broad power should be liberally construed (New York v Mastriano, 189 AD2d 766, 767 [2d Dept 1993]). In this case, recission requires a complete accounting, vacating confessions of judgment, terminating liens or security interests, and the return of all interest (i.e., daily amounts collected and all other fees and amounts collected) for all MCAs dating back to June 10, 2014 (other than principal advanced by the Predatory Lenders which has been returned to the Predatory Lenders) at the Predatory Lenders' joint and several sole cost and expense.[FN22]
The NY AG is also entitled to an order that the Predatory Lenders (i) are permanently enjoined from engaging in the fraudulent and illegal practices set forth in the amended petition, (ii) must cease all collection of payment or other monies related to the Loan Documents, and (iii) must each pay $2,000 pursuant to CPLR 8303(a)(6).
The Predatory Lenders mistakenly rely on Hope v Contemporary Funding Group, 128 AD2d 673 (2d Dept 1987), in arguing that, to the extent they are required to return interest, the amount returned should be limited to only the amounts deemed usurious and not all of the interest that they charged. This idea, however, has been rejected by the Court of Appeals (Wilson, J.) in Adar Bays. That case makes clear that upon a finding of criminal usury, the loan transaction is void and borrowers are not limited in remedy to only a reduction of the interest rate to the legally amount charged or that the NY AG is only entitled to seek the amount of interest which exceeds the legal limit:
The legislature, for example, expressly provided that savings banks entering into a usurious loan will forfeit interest but not principal (General Obligations Law § 5-511 [1]). Yet, despite numerous entreaties over many centuries, other than the exception for savings banks, the legislature has never addressed complaints by permitting courts to limit a borrower's remedy for a usurious loan to reduction of the interest rate or loss of interest only. Thus, loans proven to violate the criminal usury statute are subject to the same consequence as any other usurious loans: complete invalidity of the loan instrument
(Adar Bays, 37 NY3d at 333 [internal footnote omitted]).
Despite the NY AG's argument to the contrary, restitution and recission do not mandate return of principal that was never the property of the Borrowers. The Restatement (Third) of Restitution and Unjust Enrichment § 49 provides that restitution is measured by the amount of the payment or the resulting increase in the defendant's net assets, whichever is less. In the case of recission of an unconscionably usurious contract where the NY AG has proved fraud, this means that the Predatory Lenders must return all monies obtained from the Borrowers. It does not however mean that the NY AG is entitled to the principal amount advanced by the Predatory Lenders as such principal that has been repaid to the Predatory Lenders did not result in an increase in the Predatory Lenders' net assets. Indeed, rescission is intended to restore both parties to the position they were in prior to the transaction, requiring a "mutual restoration and [*18]accounting in which each party restores property received from the other to the extent such restoration is feasible" (id., § 54).[FN23]

Finally, the Court notes that certain of the Predatory Lenders have argued that the relief sought in this proceeding is not appropriate because either (i) they have settled other proceedings brought against them by agreeing to the injunctive relief sought here by the NY AG or (ii) that certain of the entity Predatory Lenders no longer exist. They are not correct. The NY AG is empowered and entrusted by the People of the State of New York to seek the relief sought here pursuant to Executive Law § 63 (12), and they can not avoid its reach merely by dissolving or by otherwise agreeing to part of the relief sought here by the NY AG in other governmental proceedings.
CPLR 8303(a)(6) provides for additional allowance at the Court's discretion in a case brought by the NY AG pursuant to Executive Law § 63(12) not to exceed $2,000 per respondent. Given the perjurious affidavits submitted in this case (and to various courts in support of the confessions of judgment as discussed above) and the otherwise entirely frivolous positions taken by the Predatory Lenders, $2,000 of costs and fees are imposed as against each of the Predatory Lenders.
The Court has considered the parties remaining arguments and finds them unavailing.
It is hereby ADJUDGED, ORDERED, and DECREED that the NY AG's motion for summary determination of the amended petition is granted; and it is further
ADJUDGED, ORDERED, and DECREED that the Predatory Lenders' cross-motions for summary determination are granted solely to the extent of dismissing the harassment claims as against all of the Predatory Lenders except Mr. Braun, RCG, and Ram; and it is further
ADJUDGED, ORDERED, and DECREED that the Predatory Lenders are permanently enjoined from engaging in the fraudulent and illegal practices set forth in the amended petition; and it is further
ADJUDGED, ORDERED, and DECREED that the Predatory Lenders shall cease all collection of payment or other monies related to the MCAs; and it is further
ADJUDGED, ORDERED, and DECREED that any agreement entered into between the Predatory Lenders and any merchant in connection with an MCA, including each Merchant Agreement, Security Agreement and Guaranty, Authorization for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), Appendix A: The Fee Structure, Addendum to Secured Purchase and Sale of Future Receivables Agreement, and form providing the Predatory Lenders with access to the merchants' bank accounts is rescinded; and it is further
ADJUDGED, ORDERED, and DECREED that the Predatory Lenders shall promptly apply for vacatur of all confessions of judgment filed by them and all judgment issued in their favor based on such filings by all courts of this State that have issued such judgments within 60 [*19]days of this Decision and Order and provide evidence of the same to the NY AG at their sole cost and expense; and it is further
ADJUDGE, ORDERED, and DECREED that all marshals and/or sheriffs who hold executions under such judgments shall stay from executing or collecting on them; and it is further
ADJUDGED, ORDERED, and DECREED that the Predatory Lenders shall file all papers sufficient to terminate all liens or security interests related to the MCAs within 60 days of this Decision and Order; and it is further
ADJUDGED, ORDERED, and DECREED that the Predatory Lenders shall provide an accounting to the Petitioner of the names and addresses of each merchant from whom the Predatory Lenders collected or received monies since June 10, 2014, in connection with the MCAs and a complete history of all monies collected or received by the Predatory Lenders from such merchants and all monies provided by the Predatory Lenders to such merchants, including principal amounts actually funded together with appropriate backup (to the extent they assert that any amount repaid by the Borrowers was a repayment of principal), within 60 days of this Decision and Order; and it is further
ADJUDGED, ORDERED, and DECREED that, in connection with such an accounting, the Predatory Lenders shall pay full restitution and damages to the Petitioner as to all merchants Borrowers that have entered into MCAs with the Predatory Lenders, including those not identified at the time of this order, and such restitution and damages shall include (i) the refund of all amounts taken by the Predatory Lenders from merchants or their guarantors in connection with the MCAs, minus the principal amounts actually funded to the Borrowers and (ii) damages for losses as set forth above within 60 days of this Decision and Order; and it is further
ADJUDGED, ORDERED, and DECREED that the Predatory Lenders shall disgorge all profits from the MCAs and other fraudulent and illegal practices set forth in the amended petition; and it is further
ADJUDGED, ORDERED, and DECREED that the Predatory Lenders shall each pay $2,000 pursuant to CPLR 8303(a)(6).
Dated: September 15, 2023
ANDREW BORROK, J.S.C.

Footnotes

Footnote 1:The NY AG seeks an accounting for all monies collected or received since February 8, 2013, but as discussed below the claims appear to be timely only as of June 10, 2014, because the petition was filed (NYSCEF Doc. No. 1) on June 10, 2020.

Footnote 2:As discussed below, Noerr-Pennington does not insulate these Predatory Lenders from liability as these perjurious affidavits were filed for no legitimate purpose and only as a further step in furtherance of their illicit operation.

Footnote 3:Under the most favorable reading of the testimony of Messrs. Braun and Reich, they do not deny that the mandatory reconciliation required by the MCAs did not occur. In fact, at most, and without any example of where this actually occurred, they indicate that the MCAs also allowed for permissive reconciliation on request of the merchant upon receipt of the bank statements and that if the merchant sent the bank statements, reconciliation would occur. This is simply insufficient to create any issues of fact as to whether reconciliation actually occurred and whether the MCAs were a legitimate purchase of accounts receivable.

Footnote 4:It thus does not matter that Section 1.8 of the MCAs provide that "[i]f Future Receipts are remitted more slowly than RCF may have anticipated or projected because Merchant' s business has slowed down, or if the full Purchased Amount is never remitted because Merchant' s business went bankrupt or otherwise ceased operations in the ordinary course of business, and Merchant has not breached this Agreement, Merchant would not owe anything to RCF and would not be in breach of or default under this Agreement" for two reasons. First, as discussed above, the Predatory Lenders made sure that the Borrowers (Merchants) were in breach of the Agreement upon execution by requiring the Borrowers to represent that the accounts receivable were not subject to other liens — knowing full well that they were. Second, because, as discussed above, the Addendum makes clear that a few missed payments do in fact cause a default. In addition, and as discussed herein, Mr. Braun's emails firmly establish that he called defaults based on missed payments and directed his co-conspirators to file Confessions of Judgment against the individual guarantors regularly. This was his real "business" practice.

Footnote 5:The Court of Appeals (Wilson, J.) decision in Adar Bays, LLC v GeneSys ID, Inc., 37 NY3d 320 (2021) is instructive. In that case, the Court chronicled the development of New York's usury laws which are codified in General Obligations Law §§ 5-501, 5-511, 5-521, Banking Law § 14-a(1), and Penal Law § 190.40 and instructed that criminal usury analysis requires "strict attention to additional fees exacted sometimes creatively through loan instruments" (id., at 336) and that New York Dry Dock Co. v American Life Ins. & Trust Co., 3 Sandf Ch 215, 252 [1846]) requires that all consideration to be paid in exchange for a loan should be valued when determining if a transaction is usurious:
Where however the object of the parties is a loan of money, and something else under the form of an exchange or sale is substituted for it, the principle of the loan, and consequently of the debt contracted by the nominal vendee, will be the value in money of the substitute received by him; and any consideration paid or secured to the vendor beyond that will in general be considered as interest for its forbearance
(Adar Bays, 37 NY3d at 337, citing New York Dry Dock Co., 3 NY at 359). In this case, there is no evidence that any of the upfront fees charged or other costs imposed were anything other than additional interest profit. As such, they are properly considered interest and subject to return as damages.

Footnote 6:As discussed more completely below, as the NY AG's special proceeding is brought pursuant to Executive Law § 63(12), New York is the center of gravity such that New York law applies to these MCAs and Haymount Urgent Care PC v. GoFund Advance, LLC, 2023 WL 5221901 (SD NY 2023) is inapposite.

Footnote 7:As discussed below, Mr. Braun and the Predatory Lenders often did not even adhere to these stated fees.

Footnote 8:One Borrower testified that the Predatory Lenders often charged double payments on the day after bank holidays, including the day after Christmas (NYSCEF Doc. No. 82, ¶ 20). Another testified that the Predatory Lenders charged payments on federal holidays, including Memorial Day, Independence Day, and Labor Day (NYSCEF Doc. No. 98, ¶ 29).

Footnote 9:The Predatory Lenders' internal communications directed payments higher than agreed upon in the MCAs (see, e.g., NYSCEF Doc. No. 204, at 1, 4 [directing payments of $999 when the MCA provided for $699]; NYSCEF Doc. No. 207, at 1, 10 [directing payments of $299 when the MCA provided for $239]).

Footnote 10:When the Predatory Lenders collected more than the Specified Percentage pursuant to the MCAs, they did not return the overcollection unless the Borrowers badgered them to do so. Multiple Borrowers testified that the Predatory Lenders continued to debit daily payments for more than a week after the total amount was repaid (see, e.g., NYSCEF Doc. No. 98, ¶ 30).

Footnote 11:The Court notes that certain of the Predatory Lenders have also submitted perjurious affidavits in this case. For example, Mr. Braun indicates in his affidavit that he was merely the underwriter (NYSCEF Doc. No. 676, ¶ 6). This is false. Stone Funding was the underwriter. The record firmly establishes that Messrs. Braun and Reich made the deals and Mr. Braun directed others to call defaults and file Confessions of Judgment (NYSCEF Doc. No. 159, at 1; NYSCEF Doc. No. 699). Indeed, the communications leave no doubt that he was in charge of the origination and management of the loans. At the hearing, counsel for Ms. Gregg corroborated this understanding — that her client was just taking orders from Mr. Braun. For his part, Mr. Reich argued that he negotiated and sometimes funded the deals on behalf of RCG only to be taken out the next day. For the avoidance of doubt, the record also firmly establishes that the Predatory Lenders acted in concert (they apparently operated out of the same room for much of the time in question).

Footnote 12:Although Ram argues that its place in the racket was to do the upfront funding and to be taken out the next day, this does not provide a basis for exculpation as to the usury, fraud or unconscionability findings. In addition, and as relevant, Ram continued to administer the Bionicle MCA (NYSCEF Doc. No. 92, ¶¶ 25 and 27). Inasmuch as Mr. Braun acted on behalf of Ram, his actions are also imputed to Ram. Nothing in the record suggests that Mr. Braun was acting outside of the scope of his responsibilities or that Ram did not know of his actions. In fact, as discussed below, Mr. Reich confirmed that he knew how Mr. Braun was treating his (Ram's) clients. 

Footnote 13:It is wholly irrelevant that, on a different record, a merchant in a private action challenging their MCA in front of a different trial court may have failed to meet their burden of proof that the MCA in question was not a usurious loan. That determination is not binding on this Court, and the NY AG, who was not a party to that action, is not collaterally or otherwise estopped, based on the substantial evidence here demonstrating that the MCAs in this case were in fact usurious loans and the product of fraud.

Footnote 14:In this regard, it is worth noting that credit card companies which charge interest which may in some jurisdictions be considered usurious generally have moved their incorporation and/or principal places of business to states like Delaware and North Dakota where more generous usury laws govern their contracts and conduct.

Footnote 15:Because there is no basis for applying any law other than New York law here, the Court need not engage in any analysis regarding whether an actual conflict exists between New York usury law and the usury law of some other jurisdiction. Having made the showing required by Executive Law § 63(12), the NY AG has made New York usury law the law applicable to this action and these MCAs. 

Footnote 16:The parties dispute whether the fees charged by the Predatory Lenders should be considered in a calculation of the interest rate. Although that argument need not be addressed for the purpose of determining whether the loans were criminally usurious (as without consideration of such fees the interest charged far exceeded the legally permissible limit), the fees were in fact disguised interest and should be characterized as such for the purposes of damages.

Footnote 17:Although a single or two instances of overcharge would not be sufficient to demonstrate fraud (where in one such instance the money was returned to the Borrower when the Borrower badgered the merchant), the totality of the circumstances unequivocally establish that Mr. Braun and the other Predatory Lenders' course of conduct included fraudulently charging as much as possible and without regard to the agreements themselves.

Footnote 18:Among other things, as discussed above, the Predatory Lenders knowingly and falsely represented to the various courts in their affidavits that monies had been collected based on the "Specified Percentage" as such term was defined in the MCAs. In actuality, as discussed above, monies had been collected based on a fixed amount without any regard whatsoever to receivables and where no reconciliation had taken place every month as required (i.e., to ensure that the Borrowers paid based on a fixed loan repayment schedule and not based on a percentage of the collected accounts receivable as required by the MCA).

Footnote 19:The Court notes that this, among other things in the record, further established beyond all doubt that Mr. Braun's affidavit that he submitted in opposition to the amended petition where he indicates that he was only the underwriter and not the boss is perjurious.

Footnote 20:For the avoidance of doubt, it does not matter that the Predatory Lenders indicate that a Borrower was represented by a sophisticated counsel. In his affidavit, Paul Price, General Counsel for one of the Borrowers, testified that (i) a representative of the Predatory Lenders described the transaction in the language of loans, including with a definite term (NYSCEF Doc. No. 98, ¶¶ 3-4), (ii) the fees were left blank and otherwise contained conditions that were not applicable to the transaction (id., ¶ 9), (iii) the terms of the MCA were not consistent with the transaction discussed with the Predatory Lenders' representative (id., ¶¶ 10-15), and (iv) the Predatory Lenders proceeded on terms that were not agreed upon on the funding call (id., ¶ 21). Thus, under these circumstances, it does not matter that a Borrower (or that some of the Borrowers) may have had a lawyer.

Footnote 21:RCG is not correct that because Mr. Braun had the title of "Senior Funding Manager" (e.g., NYSCEF Doc. No. 226) and not President, Chief Executive Officer, Chief Operating Officer or the like that they can evade responsibility for his conduct. The record clearly demonstrates that it was Mr. Braun who ran the racket and interacted directly with the victim Borrowers on behalf of RCG and often on behalf of Ram as both Mr. Reich testified and as the victim Borrower testified (see, e.g., NYSCEF Doc. No. 92).

Footnote 22:The Predatory Lenders are not entitled to individual apportionment based on their respective fault because they are not being punished as a class. Rather, they are legally responsible for their own individual conduct under each MCA, and are responsible for that specific conduct. In any event, class apportionment generally is a remedy available to the complaining party when that party is incapable of properly assigning risk among competing defendants. It is not a remedy that wrongdoers may use to shield themselves from damages.

Footnote 23:The Court notes that the New York cases cited by the NY AG do not stand for the proposition that the Predatory Lenders should be required to surrender principal which was not the Borrowers prior to the time that the transaction were consummated. For example, in People v Greenberg, 27 NY3d 490 (2016), the Court of Appeals held that disgorgement merely requires the return of wrongfully obtained profits and does not result in any actual economic penalty. Matter of the State of New York v Maiorano, 189 AD2d 766 (1st Dept 1993), merely stands for the proposition that restitution is a remedy available to the NY AG.